Sherry K. BROUGHTON, Individually and as Next Friend of Timothy Fettes, and Dennis Broughton, Plaintiffs,

v.

ST. JOHN HEALTH SYSTEM and St. John Oakland Hospital, jointly and severally, Defendants.

No. CIV. 02–40110.

United States District Court, E.D. Michigan, Southern Division.

Feb. 21, 2003.

Steven E. Goren, Goren & Goren, Bingham Farms, for Sherry K. Broughton, Individually and as Next Friend of Timothy Fettes and Dennis Broughton, Timothy Fettes, Dennis Broughton, plaintiffs.

Steve N. Cheolas, Kitch, Saurbier, Mount Clemens, for St. John Health System, St. John Oakland Hospital, defendants.

## MEMORANDUM OPINION AND ORDER

GADOLA, District Judge.

Before the Court is Defendant's "motion for summary judgment pursuant to [Federal Rule of Civil Procedure] 12(b)(6)" [docket entry 6], which the Court construes as a motion to dismiss. The Court has determined that a hearing would not aid significantly in the disposition of this motion. *See* E.D. Mich. LR 7.1(e)(2). For the reasons set forth below, the Court shall grant Defendants' motion in part and shall dismiss Plaintiffs' claims under the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, without prejudice. In addition, the Court shall grant Plaintiffs' request to file an amended complaint.

## I. BACKGROUND

The following facts are alleged in the Complaint. On January 17, 2001, Plaintiff Sherry K. Broughton ("Ms. Broughton") entered the emergency department at Oakland Hospital in Oakland County, Michigan. (Compl. ¶¶ 7, 10.) Defendants St. John Health System and St. John Oakland Hospital operated Oakland Hospital on the date in question. (Compl. ¶ 7.) Ms. Broughton complained of a headache that had lasted for a week, positive light sensitivity, nausea, vomiting and decreased appetite. (Compl. ¶¶ 11–12.) Ms. Broughton was accompanied by her daughter, Robin Broughton, who reported to the emergency department that her mother had collapsed and that her mother's nausea and vomiting symptoms were severe. (Compl. ¶ 13.) Hospital personnel performed a CT scan of Ms. Broughton's head and reported that the scan was "essentially unremarkable." (Compl. ¶ 14.) Hospital personnel discharged Ms. Broughton approximately three hours after she had reported to the emergency department. (Compl. ¶ 15.) At some point after her discharge from Oakland Hospital, Ms. Broughton "suffered permanent brain damage/ a brain infarct resulting in permanent brain damage and disability." (Compl. ¶ 21.)

On April 25, 2002, Plaintiffs filed suit in this Court under the Emergency Medical Treatment and Active Labor Act ("Emergency Act" or "Act"), 42 U.S.C. § 1395dd. Plaintiffs also asserted two state law claims for loss of consortium. The Court dismissed the loss of consortium claims without prejudice, declining to exercise supplemental jurisdiction over Plaintiffs' state law claims.

Plaintiffs allege that Defendants violated the Act by: (1) failing to provide Ms. Broughton with "an appropriate medical screening examination" as required by

§ 1395dd(a), and (2) discharging Ms. Broughton in violation of the transfer provisions of § 1395dd(c). Now before the Court is Defendants' "motion for summary judgment pursuant to [Federal Rule of Civil Procedure] 12(b)(6)." In their motion, Defendants assert that Plaintiffs have failed to state a claim under the Act upon which relief may be granted.

Although styled as a motion for summary judgment, the Court construes Defendants' motion as a motion to dismiss. In their motion, Defendants rely solely upon the legal standard applicable to Rule 12(b)(6), and appropriately under this Rule, Defendants' substantive arguments challenge the sufficiency of the pleadings. Moreover, it is the Court's general policy not to consider motions for summary judgment prior to the close of discovery. *See Ramik v. Darling Int'l, Inc.,* 161 F.Supp.2d 772, 776 n. 1 (E.D.Mich.2001) (Gadola, J.). Accordingly, because the Court construes Defendants' motion as a motion to dismiss, the Court will not consider the exhibits that the parties have included with their pleadings.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes the district courts to dismiss any complaint that fails "to state a claim upon which relief can be granted." Rule 12(b)(6) affords a defendant an opportunity to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true. In applying the standards under Rule 12(b)(6), the Court must presume all well-pleaded factual allegations in the complaint to be true and draw all reasonable inferences from those allegations in favor of the non-moving party. *Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993).

The Court will not, however, accord the presumption of truthfulness to any legal conclusion, opinion or deduction, even if it is couched as a factual allegation. *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987). The Court will not dismiss a cause of action "for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Although the pleading standard is liberal, bald assertions and conclusions of law will not enable a complaint to survive a motion pursuant to Rule 12(b)(6). *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996).

## III. ANALYSIS

Congress passed the Emergency Act in 1986 in response to "highly publicized incidents where hospital emergency rooms allegedly, based only on a patient's financial inadequacy, failed to provide a medical screening that would have been provided a paying patient, or transferred or discharged a patient without taking steps that would have been taken for a paying patient." *Cleland v. Bronson Health Care Group, Inc.,* 917 F.2d 266, 268 (6th Cir. 1990); *see Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1039 (C.A.D.C.1991) (*noting that* "[t]he statute was designed principally to address the problem of 'patient dumping,' whereby hospital emergency rooms deny uninsured patients the same treatment provided paying patients, either by refusing care outright or by transferring uninsured patients to other facilities"). Although Sixth Circuit in *Cleland* noted that Congress likely passed the Act for the purpose of protecting indigent or uninsured patients, the court found that, under the plain language of the statute, the Act has a far broader reach. *See* 917 F.2d at 269–70. Thus, noting that the Act extends eligibility to "any individual," *see id.,* the court held

"that this statute applies to any and all patients." *Id.* at 268.

The Act, which applies to Medicare-provider hospitals, *see Gatewood,* 933 F.2d at 1039, imposes upon such hospitals three primary duties, which are encompassed in subsections (a), (b), and (c) of § 1395dd.

Section 1395dd(a), which outlines the "screening" requirement, provides:

**(a) Medical screening requirement**

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, *the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department,* including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

42 U.S.C. § 1395dd(a) (emphasis added).

Section 1395dd(b), which outlines the "stabilization" requirement, provides, in pertinent part:

**(b) Necessary stabilizing treatment for emergency medical conditions and labor**

(1) In general

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital *and the hospital determines that the individual has an emergency medical condition, the hospital must provide either-*

(A) within the staff and facilities available at the hospital, for such further medical examination and such *treatment as may be required to stabilize the medical condition,* or

(B) *for transfer of the individual to another medical facility in accordance with subsection (c) of this section.*

42 U.S.C. § 1395dd(b) (emphasis added).

Section 1395dd(c), which outlines the "transfer" restrictions, provides, in pertinent part:

**(c) Restricting transfers until individual stabilized**

(1) Rule

*If an individual at a hospital has an emergency medical condition which has not been stabilized* (within the meaning of subsection (e)(3)(B) of this section), *the hospital may not transfer [or discharge] the individual unless-*

(A)(i) the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility,

(ii) a physician (within the meaning of section 1395x(r)(1) of this title) has signed a certification that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer, or

(iii) if a physician is not physically present in the emergency department at the time an individual is transferred, a qualified medical person (as defined by the Secretary in regulations) has signed a certification described in clause (ii) after a physician (as defined in section 1395x(r)(1) of this title), in consultation with the person, has made the determination described in such clause, and sub-

sequently countersigns the certification; and

(B) the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

42 U.S.C. § 1395dd(c) (emphasis added).

As noted above, Plaintiffs allege violations of subsections (a) and (c). The Court now turns to Plaintiffs' allegations.

### A. 42 U.S.C. § 1395dd(a)

Although the *Cleland* court concluded that eligibility under the Act could be determined from the plain language of the statute, the court found the phrase "appropriate medical screening" in § 1395dd(a) to be ambiguous. 917 F.2d at 271. Therefore, the court looked to the Act's legislative history as well as other aids to construction in order to interpret this phrase. *Id.* In the court's view,

the terms of the statute, specifically referring to a medical screening exam by a hospital "within its capabilities" precludes resort to a malpractice or other objective standard of care as the meaning of the term "appropriate." *Instead, "appropriate" must more correctly be interpreted to refer to the motives with which the hospital acts.* If it acts in the same manner as it would have for the usual paying patient, then the screening provided is "appropriate" within the meaning of the statute.

*Id.* at 272 (emphasis added).

▮ Thus, the *Cleland* court concluded that an "appropriate medical screening" under § 1395dd(a) "mean[s] a screening that the hospital would have offered to any paying patient." 917 F.2d at 268. The *Cleland* court provided examples of situations in which a hospital would be liable for failing to provide an "appropriate medical screening," explaining:

[a] hospital that provides a substandard (by its standards) or nonexistent medical screening for any reason (including, without limitation, race, sex, politics, occupation, education, personal prejudice, drunkenness, spite, etc.) may be liable under this section . . . . .

We can think of many reasons other than indigency that might lead a hospital to give less than standard attention to a person who arrives at the emergency room. These might include: prejudice against the race, sex, or ethnic group of the patient; distaste for the patient's condition (*e.g.,* AIDS patients); personal dislike or antagonism between the medical personnel and the patient; disapproval of the patient's occupation; or political or cultural opposition. If a hospital refused treatment to persons for any of these reasons, or gave cursory treatment, the evil inflicted would be quite akin to that discussed by Congress in the legislative history, and the patient would fall squarely within the statutory language. On the other hand, if, as appears to be the case here (and as is not contradicted in the pleading), a hospital provides care to the plaintiff that is no different than would have been offered to any patient, and, from all that appears, is "within its capability" (that is, constitutes a good faith application of the hospital's resources), then the words "appropriate medical screening" in the statute should not be interpreted to go beyond what was provided here.

*Id.*

▮ Thus, courts have characterized the holding in *Cleland* as requiring plaintiffs to demonstrate that the hospital's failure to provide a standard screening examination was based upon an "improper motive." *See, e.g., Roberts v. Galen of Virginia, Inc.,* 525 U.S. 249, 252, 119 S.Ct. 685, 142 L.Ed.2d 648 (1999) (per curiam); *Baber v.*

*Hosp. Corp. of Am.,* 977 F.2d 872, 880 n. 8 (4th Cir.1992); *Newsome v. Mann,* 105 F.Supp.2d 610, 611–12 (E.D.Ky.2000); *but see Power v. Arlington Hosp. Ass'n,* 42 F.3d 851, 857 (4th Cir.1994) (noting "that the expanse of motives suggested by the Sixth Circuit in *Cleland* is so broad as to be no limit at all, and as a practical matter amounts to not having a motive requirement").

■ In the present case, Plaintiffs allege that Defendants violated § 1395dd(a), which requires "an appropriate medical screening examination," by:

a. Failing to take a sufficient history

b. Failing to perform a funduscopic examination

c. Failing to do a neurological workup or obtain a neurological consult;

d. Failing to perform a lumbar puncture;

e. Failing to perform an MRI;

f. Failing to recheck Plaintiff Sherry K. Broughton's blood pressure

g. Failing to consider the fact that Plaintiff Sherry K. Broughton had a blanket with her to shield her eyes from the light;

h. Failing to chart and take into account Plaintiff Sherry K. Broughton's comment that her headache was the "worst headache of her life";

i. Failing to chart and take into account the reports of Plaintiff Sherry K. Broughton's daughter;

j. Failing to entertain the differential diagnoses of possible tumor, psuedotumor, thrombosis and subarachnoid hemorrhage;

k. Failing to get a proper reading of the CT film by an appropriate physician;

l. Otherwise failing to perform an appropriate medical screening examina-

tion to determine whether or not Plaintiff Sherry K. Broughton had an emergency medical condition.

(Compl.¶ 17.).

Defendants argue that Plaintiffs have failed to state a claim under § 1395dd(a) because they have not alleged that Oakland Hospital's failure to perform an appropriate medical screening was due to an improper motive, as required by *Cleland.* The Court agrees with this conclusion. Essentially, Plaintiffs allege that Defendants are liable under the Act because Oakland Hospital failed to conduct certain medical diagnostic tests. In *Cleland,* the Sixth Circuit rejected the plaintiffs' contention "that 'appropriate' denotes, at a minimum, the full panoply of state malpractice law, and at a maximum, includes a guarantee of successful result." 917 F.2d at 271.

Although Plaintiffs imply that Oakland Hospital's failure to conduct certain tests constitutes inadequate screening in violation of § 1395dd(a), Plaintiffs have not alleged "that this outcome would have been any different for a patient of any other characteristics." *Id.* In other words, Plaintiffs have not alleged that Oakland Hospital's failure to conduct these tests was due to Ms. Broughton's sex, race, national origin, financial condition, political affiliation, social status, or any other impermissible motive. Accordingly, "the complaint simply fails to allege any inappropriateness in the medical screening in the sense required by the Act." *Id.; see Newsome,* 105 F.Supp.2d at 612 (granting defendants' motion for summary judgment under *Cleland* where plaintiff had not alleged improper motive).

Plaintiffs' arguments in opposition are unpersuasive. Plaintiffs argue that the Supreme Court's decision in *Roberts v. Galen of Virginia, Inc.,* 525 U.S. 249, 119

S.Ct. 685, 142 L.Ed.2d 648 (1999), casts doubt upon the "improper motive" requirement of *Cleland.* As Plaintiff's acknowledge, however, the Supreme Court in *Roberts* was addressing the "stabilization" requirement in § 1395dd(b), not the screening requirement in § 1395dd(a). *Id.* at 252, 119 S.Ct. 685. In *Roberts,* the Supreme Court held that, in order to recover under § 1395dd(b)(1)(A), which requires hospitals to provide "such further medical examination and such treatment as may be required to stabilize the medical condition," a plaintiff is not required to allege that the hospital's failure to stabilize the patient was due to an improper motive. *Id.* at 253, 119 S.Ct. 685. The Court also distinguished § 1395dd(a), which requires an "appropriate medical screening," from § 1395dd(b), which is not qualified by the requirement of "appropriateness." *Id.* at 252–53, 119 S.Ct. 685. Further, although the Court noted that the *Cleland* court's *improper motive requirement is in conflict* with the law of other circuits, *id.* at 253 n. 1, 119 S.Ct. 685, the Court expressed no opinion on the issue. *Id.* at 253, 119 S.Ct. 685.

This Court is not unswayed by the Supreme Court's observation that *Cleland* stands in contrast to the law in other circuits. *See Roberts,* 525 U.S. at 253 n. 1, 119 S.Ct. 685 (citing *Summers v. Baptist Med. Ctr. Arkadelphia,* 91 F.3d 1132, 1137–1138 (8th Cir.1996) (en banc); *Correa v. Hosp. San Francisco,* 69 F.3d 1184, 1193–1194 (1st Cir.1995); *Repp v. Anadarko Munic. Hosp.,* 43 F.3d 519, 522 (10th Cir.1994); *Power v. Arlington Hosp. Assn.,* 42 F.3d 851, 857 (4th Cir.1994); *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1041 (D.C.Cir.1991)). Indeed, this Court respectfully questions the correctness of the improper motive requirement that the *Cleland* court has grafted onto § 1395dd(a). The Fourth Circuit in *Power* offered what is in this Court's view a valid criticism of the improper motive requirement:

First, there is nothing in the statute itself that requires proof of indigence, inability to pay, or any other improper motive on the part of a hospital as a prerequisite to recovery. The language of subsection 1395dd(a) simply refers to "any individual" who presents to the emergency room. Second, it seems to us that the expanse of motives suggested by the Sixth Circuit in *Cleland* is so broad as to be no limit at all, and as a practical matter amounts to not having a motive requirement. Anyone who alleges that she did not receive an appropriate medical screening examination can simply find an improper motive that fits, whether it is sex, nationality, income, or occupation, and simply allege it. Which leads, thirdly, to the most fundamental problem with the motive requirement: the proof predicament. We agree with Power's position that having to prove the existence of an improper motive on the part of a hospital, its employees or its physicians, would make a civil EMTALA claim virtually impossible. We do not believe that proving the inner thoughts and prejudices of attending hospital personnel is required in order to recover under EMTALA.

42 F.3d at 857–58.

Rather, in this Court's view, the better interpretation of "appropriate medical screening" was set forth by the District of Columbia Circuit in *Gatewood.* There, the D.C. Circuit concluded that "a hospital fulfills the 'appropriate medical screening' requirement when it conforms in its treatment of a particular patient to its standard screening procedures." *Gatewood,* 933 F.2d at 1041. Moreover, "any departure from standard screening procedures constitutes inappropriate screening in violation of the Emergency Act." *Id.* The court

in *Gatewood* noted that "[t]he motive for such departure is not important to this analysis, which applies whenever and for whatever reason a patient is denied the same level of care provided others and guaranteed him or her by subsection 1395dd(a)." *Id.; see also Summers,* 91 F.3d at 1137–38 ("[T]he statute is ... a strict-liability provision. If a hospital fails to provide an appropriate medical screening examination, it is liable, no matter what the motivation was for this failure.... [T]he statute contains no such requirement."). Nevertheless, the holding in *Cleland* remains undisturbed in the Sixth Circuit, and this Court recognizes that holding as binding precedent. *See Newsome,* 105 F.Supp.2d at 611 n. 1 (concluding that *Roberts* did not overrule *Cleland,* and that, in the Sixth Circuit, plaintiffs still must allege an improper motive in order to recover under § 1395dd(a)).

Plaintiffs raise the interesting argument that *Cleland* did not in fact hold that "improper motive" is an element of a claim under § 1395dd(a). In support of this argument, Plaintiffs note that the court in *Cleland* specifically defined "appropriate medical screening" as "a screening that the hospital would have offered to any paying patient." 917 F.2d at 268. Moreover, as Plaintiffs note, the *Cleland* court stated that " 'appropriate' can be taken to mean care similar to care that would have been provided to any other patient, or at least not known by the providers to be insufficient or below their own standards." *Id.* at 271. Thus, in light of these passages, Plaintiffs contend that they need allege only that the screening provided by Oakland Hospital was inadequate when compared to that which the hospital offered to any paying patient, or that the hospital failed to meet its own standards.

Plaintiffs' argument, however, is premised upon isolated statements from the opinion and fails to explain the *Cleland* court's unambiguous statement that " '*appropriate' must more correctly be interpreted to refer to the motives with which the hospital acts.*" 917 F.2d at 272 (emphasis added). Even if Plaintiffs were correct in their reading of *Cleland,* they have not alleged in the Complaint that Oakland Hospital treated Ms. Broughton differently from any other patient, or that the Hospital failed to meet its own standards.

Finally, Plaintiffs argue that, because they have alleged that Defendants "fail[ed] to perform an appropriate medical screening examination," they have stated a claim under § 1395dd(a). This allegation, which provides no more than a mere recitation of the statute, is insufficient to state a claim. As this Court noted above, bald assertions and conclusions of law will not enable a complaint to survive a motion pursuant to Rule 12(b)(6). *Leeds,* 85 F.3d at 53. Accordingly, the Court shall dismiss Plaintiffs' claim under 42 U.S.C. § 1395dd(a) for failure to state a claim upon which relief may be granted.

### B. 42 U.S.C. § 1395dd(c)

Plaintiffs' second claim under the Act is that Defendants violated the transfer restrictions encompassed in § 1395dd(c). In the Complaint, Plaintiffs allege that Defendants "had the duty not to transfer Plaintiff Sherry K. Broughton except as provided in 42 U.S.C. [§ ] 1395dd(c)(1)." (Compl.¶ 19.) Plaintiffs further allege that Defendants violated the Act by discharging Ms. Broughton:

a. When it was not likely, within reasonable medical certainty, that no material deterioration of her condition would result from or occur during the transfer; and

b. Without informing Plaintiff Sherry K. Broughton of the hospital's obligations under [the Act] and the

risks of the transfer and when the Plaintiff Sherry K. Broughton did not request transfer to another medical facility in writing; and

c. When no physician or other qualified person signed a certification as provided in [§ 1395dd(c)(1)(A)(iii) ] based upon the information available at the time of transfer that the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweighed the increased risks to Plaintiff Sherry K. Broughton.

(Compl.¶ 20.)

Subsection (c) provides, in pertinent part:

"If an individual at a hospital *has an emergency medical condition* which has not been stabilized (within the meaning of subsection (e)(3)(B) of this section), the hospital may not transfer [or discharge] the individual unless ... [certain conditions have been satisfied]."

42 U.S.C. § 1395dd(c)(1) (emphasis added).

Plaintiffs argue that, in order to state a claim under subsection (c), they need not allege that the hospital *determined* that Ms. Broughton had an emergency medical condition, as required under subsection (b). In fact, Plaintiffs admit in their response brief that Oakland Hospital apparently did not make such a determination in Ms. Broughton's case. Therefore, Plaintiffs contend that they must allege merely that Ms. Broughton *had* an emergency medical condition in order to state a claim under subsection (c).

Subsection (b), the stabilization provision, provides, in pertinent part:

"[i]f any individual ... comes to a hospital *and the hospital determines that the individual has an emergency medical condition,* the hospital must provide either ... for such further medical examination and such treatment as may be required to stabilize the medical condition, or ... *for transfer of the individual to another medical facility in accordance with subsection (c) of this section."*

42 U.S.C. § 1395dd(b)(1) (emphasis added). Despite the reference to subsection (c) in the text of subsection (b), Plaintiffs contend that these subsections operate independently of each other.

■ In contrast to Plaintiffs' view, the circuit courts that have addressed this issue have concluded uniformly that liability for transfer or discharge under subsection (c) is predicated upon the hospital's *determination* that an individual has an emergency medical condition under subsection (b). *See Lopez–Soto v. Hawayek,* 175 F.3d 170, 175 (1st Cir.1999); *James v. Sunrise Hosp.,* 86 F.3d 885, 888–89 (9th Cir.1996); *Summers v. Baptist Med. Ctr. Arkadelphia,* 91 F.3d 1132, 1140 (8th Cir.1996) (en banc); *Urban v. King,* 43 F.3d 523, 526 (10th Cir.1994); *Baber v. Hosp. Corp. of Am.,* 977 F.2d 872, 883 (4th Cir.1992); *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1041 (D.C.Cir.1991).

The First Circuit in *Lopez–Soto* explained the link between subsections (b) and (c) as follows:

The linkage of subsections (b) and (c) finds explicit support in the text of subsection (b)(1), which ties the need for stabilization of discerned emergency medical conditions to the transfer restrictions imposed by subsection (c). *See* 42 U.S.C. § 1395dd(b)(1)(B) (explaining that, if a hospital determines that an emergency medical condition exists, it either must stabilize the individual or transfer him "in accordance with subsection (c)"). This furnishes a sound reason, *embedded in the statute's text,* to read subsection (c)'s qualified prohibi-

tion on unstabilized transfers in tandem with subsection (b)'s requirement that the hospital actually detect the emergency medical condition.

175 F.3d at 175.

The Ninth Circuit in *James* also reasoned that:

> [i]t is hard to see why Congress would say in subsection (b) that the transfer has to be "in accordance with subsection (c)," unless it meant for subsection (c) to regulate the transfers made in accord with subsection (b). The transfer section, (c), appears to be designed to deal with some people who are found to have emergency medical conditions under subsection (b).

86 F.3d at 888.

Finally, the Tenth Circuit in *Urban* stated concisely:

> The interplay between § 1395dd(c) and § 1395dd(b) ... supports the requirement of actual knowledge of the emergency medical condition. The provisions of § 1395dd(c) are triggered only if § 1395dd(b)'s requirements have been met: If a hospital "determines that the individual has an emergency medical condition," under § 1395dd(b), then the hospital must comply with the requirements of § 1395dd(c). *See* 42 U.S.C. § 1395dd(b). Subsection 1395dd(c) delineates what must be done before the individual may be transferred. See 42 U.S.C. § 1395dd(c). Therefore, § 1395dd(c) only comes into effect if the hospital has "determined" an emergency medical condition exists pursuant to § 1395dd(b). The statute's stabilization and transfer requirements do not apply until the hospital determines the individual has an emergency medical condition.

43 F.3d at 526.

This Court finds the overwhelming weight of circuit court authority on this issue to be highly persuasive. Thus, consistent with that authority, this Court holds that subsections (b) and (c) of § 1395dd must be read together, and that in order for a hospital to be liable under subsection (c), the transfer and discharge provision, the hospital must have "determined" that an "emergency medical condition" exists under subsection (b), the stabilization provision.

The Court also notes that the Sixth Circuit's decision in *Cleland* appears to support the position adopted by the other circuit courts that have addressed this issue. Although the court in *Cleland* did not state expressly that it was discussing the interplay between subsections (b) and (c), the decision provides support for the position that liability under subsection (c) is predicated upon the hospital's determination that an individual has an emergency medical condition under subsection (b).

For example, the court in *Cleland* set forth the following general duties that hospitals have under the Act:

> (1) To provide "an appropriate medical screening examination within the capability of the hospital's emergency department" to "any individual [who] comes to the emergency department" and seeks examination or treatment. 42 U.S.C. § 1395dd(a).

> (2) *If the "hospital determines that the individual has an emergency medical condition," to stabilize the medical condition before transferring (or discharging) a patient.* 42 U.S.C. § 1395dd(b)(1) and (c)(1).

917 F.2d at 268 (emphasis added).

Further, the court noted that "*a discharge that to the knowledge of those conducting it left a patient with an 'emergency medical condition' in an 'unstable' condition would be actionable.*" *Id.* at 272 (emphasis added). These passages

from *Cleland* support the position that liability under subsection (c) depends upon the hospital's determination under subsection (b) that an individual has an emergency medical condition.

Plaintiffs cite a single case, *Smith v. Richmond Memorial Hospital*, 243 Va. 445, 416 S.E.2d 689 (Va.1992), in support of their contention that subsections (b) and (c) of the Act operate independently of each other. Although the Supreme Court of Virginia in *Smith* concluded that subsections (a), (b), and (c) of the Act "each ... describe[ ] distinct patient circumstances requiring different treatment protocols," 243 Va. at 451, 416 S.E.2d at 692, the court was not addressing the precise issue raised by Plaintiffs in the present case. Rather, in *Smith*, the defendant hospital had argued that "coming to an emergency room in an emergency medical condition or in active labor [was] a prerequisite to the application of the treatment and transfer provisions of subsections (b) and (c) of the Act." 243 Va. at 449–50, 416 S.E.2d at 691. The Virginia Supreme Court disagreed with the defendant's interpretation of the Act, holding that:

> [t]he statutory language clearly requires a patient to be in an emergency medical condition or to be in active labor before the provisions of subsections (b) and (c) apply. But we find nothing in the language of the Act which limits application of these subsections solely to a patient who initially arrives at the emergency room and who has not been stabilized, as the Hospital argues here.

243 Va. at 452, 416 S.E.2d at 692.

In reaching this conclusion, the court found that subsections (a), (b) and (c) of the Act

> describe[ ] distinct patient circumstances requiring different treatment protocols. If an individual *"comes to the emergency department,"* the hospital must provide

an appropriate medical screening examination. [42 U.S.C. § 1395dd(a) ]. If an individual *"comes to a hospital"* and the hospital determines that an emergency medical condition or active labor exists, the hospital must stabilize the condition or transfer the person. *Id.* § 1395dd(b). If a *"patient at a hospital"* has an emergency condition or is in active labor, the hospital may transfer that patient only under certain conditions. *Id.* § 1395dd(c).

243 Va. at 451, 416 S.E.2d at 692.

Thus, the primary issue in *Smith* was "whether [the Act's] treatment and transfer requirements are limited solely to an emergency medical condition or active labor *which has not been stabilized and which occurs in conjunction with initial admission to an emergency department."* 243 Va. at 450, 416 S.E.2d at 691 (emphasis added). Although the Virginia Supreme Court concluded that each subsection provides a separate "treatment protocol," the court did not address the interplay between subsections (b) and (c) presented in this case, that is, whether the hospital must first *determine* that an individual has an emergency medical condition in order for liability to attach under subsection (c). It appears that the Virginia Supreme Court assumed that such a showing was not necessary, insofar as the court found that the plaintiff had stated a claim under subsection (c) by alleging that she "had an emergency medical condition at the time of transfer and that the Hospital did not comply with the requirements for transfer." 243 Va. at 455, 416 S.E.2d at 694. Nevertheless, because the Virginia Supreme Court did not address the precise issue at hand in this case, the court's decision in *Smith* is not as persuasive as the numerous circuit courts that have addressed this issue directly.

Thus, in light of the overwhelming circuit court authority directly on point, the Sixth Circuit's decision in *Cleland,* and the distinction between the Virginia Supreme Court's decision in *Smith* and the present case, Plaintiffs' argument that Defendants may be liable under subsection (c) even though Oakland Hospital did not determine that Ms. Broughton had an emergency medical condition is unavailing. Accordingly, the Court shall dismiss Plaintiffs' claim under 42 U.S.C. § 1395dd(c) for failure to state a claim upon which relief may be granted.

## IV. REQUEST FOR LEAVE TO AMEND

■ In their response to Defendants' motion to dismiss, Plaintiffs request leave to amend the Complaint should the Court decide in Defendants' favor. Because Defendants have filed an answer, Plaintiffs may file an amended complaint "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed. R.Civ.P. 15(a).

"A dismissal under Rule 12(b)(6) generally is not final or on the merits and the court normally will give plaintiff leave to file an amended complaint." 5A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (2d ed.1990 & supp.2002). Granting leave freely under Rule 15 "reinforce[s] the principle that cases should be tried on their merits rather than the technicalities of pleadings." *Tefft v. Seward,* 689 F.2d 637, 639 (6th Cir.1982).

Amendment should be refused only if it appears to a certainty that plaintiff cannot state a claim. The better practice is to allow at least one amendment regardless of how unpromising the initial pleading appears because except in unusual circumstances it is unlikely that the court will be able to determine conclusively on the face of a defective pleading whether plaintiff actually can state a claim.

Wright & Miller § 1357.

Plaintiffs argue that, if the Court were to permit them to amend the Complaint, they would be able to state a claim under § 1395dd(a). Plaintiffs have not submitted a proposed amendment. Nevertheless, Plaintiffs represent that the facts would support an allegation that Oakland Hospital did not provide Ms. Broughton with the same type of screening that the Hospital would have provided to any other patient with the same symptoms. Further, Plaintiffs assert that the screening examination that the Hospital did provide Ms. Broughton was below the Hospital's own standards. Finally, Plaintiffs suggest that Oakland Hospital may have acted with an improper motive when it allegedly failed to provide Ms. Broughton with an appropriate medical screening examination. Based upon Plaintiffs' representations, the Court finds that Plaintiffs *may* be able to state a claim under § 1395dd(a) if the Court were to permit them to file an amended complaint. Accordingly, in light of the general policy that courts should adjudicate cases on their merits rather than on technical pleading grounds, the Court shall grant Plaintiffs leave to amend their Complaint to cure the deficiencies discussed in this opinion with regard to their claim under § 1395dd(a).

Plaintiffs do not indicate the manner in which they would amend their claim under § 13955dd(c). It appears less likely that Plaintiffs will be able to cure the defect in this claim, especially since Plaintiffs have admitted in their brief that Oakland Hospital did not determine that Ms. Broughton had an emergency medical condition. Nevertheless, if the facts would permit Plaintiffs to state a claim of improper

transfer or discharge, as discussed in this opinion, the Court shall permit Plaintiffs to amend this claim as well.

## IV. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' "motion for summary judgment pursuant to [Federal Rule of Civil Procedure] 12(b)(6)" [docket entry 6], which the Court construes as a motion to dismiss, is **GRANTED** in part, and Plaintiffs' claims under 42 U.S.C. §§ 1395dd(a) and (c)are **DISMISSED WITHOUT PREJUDICE.**

**IT IS FURTHER ORDERED** that Plaintiffs may filed an amended complaint, consistent with the Court's opinion, within thirty (30) days of the filing of this order.

**SO ORDERED.**