**ESTATE OF Johnny Ray ROBBINS, Plaintiff,**

v.

**OSTEOPATHIC HOSPITAL FOUNDERS ASSOC.; Dr. Christine Gentry, Dr. Robert Archer, Dr. K. Fisher, and the United States of America, Defendants.**

No. 97–C–348–K.

United States District Court, N.D. Oklahoma.

Jan. 13, 2000.

---

Ronald Dawson Wood, Kevin Scott Hoskins, Wood & McGonigle, Tulsa, OK, Russell D. Abbott, Holden & McKenna, Tulsa, OK, for Lisa M. Canady.

Stephen John Rodolf, Karen L. Callahan, Rodolf & Todd, Tulsa, OK, for Notami Hospitals of Oklahoma, Osteopathic Hosp. Founders Ass'n, K.T. Fisher.

Donald G. Hopkins, Tulsa, OK, D. Christian Wise, Springfield, MO, for Christine Gentry.

Christine Gentry, Ava, MO, pro se.

Steven Ernest Holden, Eric Edward Packel, Holden & McKenna, Tulsa, OK, Jeffrey A. Glendening, Rodolf & Todd, Tulsa, OK, for Robert Archer.

Phil Pinnell, Loretta F. Radford, U.S. Atty., Tulsa, OK, for Veterans Admin.

## ORDER

KERN, Chief Judge.

Before the Court is the motion for summary judgment of defendant Osteopathic Hospital Founders Association d/b/a Tulsa Regional Medical Center ("TRMC"). Plaintiff brings this action based upon the circumstances of the death of Johnny Ray Robbins ("Robbins"). Robbins was treated from March 8, 1995 to April 4, 1995, at the Oklahoma City Veterans' Administration Hospital ("VA Hospital"). He was admitted to the TRMC emergency room

on April 17, 1995. After examination, Robbins was diagnosed by Dr. Gentry with "pseudoaneurysm with hemorrhage (spontaneous) left fem/pop graft site". Dr. Fisher arranged for Robbins to be transferred to the VA Hospital, where he died the same day.

Plaintiff brings state medical malpractice claims against the defendants, but against TRMC also asserts a violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"). A claim may be brought against a hospital under EMTALA for failing to conduct an appropriate medical screening (42 U.S.C. § 1395dd(a)), failing to further examine and treat a person whom the hospital has determined has an emergency medical condition (42 U.S.C. § 1395dd(b)(1)(A)), improperly discharging such a person prior to stabilization, (42 U.S.C. § 1395dd(b)(1)), or improperly transferring such a person prior to stabilization (42 U.S.C. §§ 1395dd(b)(1)(B) & 1395dd(c)). *Scott v. Hutchinson Hosp.*, 959 F.Supp. 1351, 1357 (D.Kan.1997). Plaintiff appears to be alleging violations of the first and fourth of these provisions.

The Court construes the factual record and all reasonable inferences in the light most favorable to the non-movant. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir.1998). Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c) F.R.Cv.P. An issue of material fact is genuine only if a party present facts sufficient to show that a reasonable jury could find in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ EMTALA obligates hospitals and emergency rooms, when requested by an individual, to screen for and stabilize emergency medical conditions. *See Roberts v. Galen of Virginia, Inc.*, 525 U.S. 249, 119 S.Ct. 685, 142 L.Ed.2d 648 (1999) (per curiam). The statute was not intended as a federal malpractice statute, but instead was enacted to prevent "patient dumping", which is the practice of refusing to treat patients who are unable to pay. *Marshall v. East Carroll Parish Hosp.*, 134 F.3d 319, 322 (5th Cir.1998). *See also Urban By and Through Urban v. King*, 43 F.3d 523, 525 (10th Cir.1994) (EMTALA neither a malpractice nor a negligence statute).

■ An "appropriate medical screening examination" is one which the hospital would have offered to any other patient in a similar condition with similar symptoms. *Id.* at 323. *See also Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519, 522 (hospital violates 1395dd(a) when it does not follow its own standard screening procedures). Thus, the statutory term "appropriate" means appropriate as a matter of equal treatment, not *medically* appropriate. The Fifth Circuit has stated that the screening examination is not judged by its proficiency in accurately diagnosing the patient's illness, but rather by whether it was performed equitably in comparison to other patients with similar symptoms. *Marshall*, 134 F.3d at 322. Thus, plaintiff's argument that defendants should have awaited the results of further blood coagulation studies is irrelevant to an EMTALA cause of action.

■ In attempting to demonstrate a cause of action, plaintiff states baldly that "Robbins received disparate and inadequate treatment based upon his status as both an indigent and a veteran." (Plaintiff's response at 8). This statement is "supported" by the further statement that Dr. Fisher arranged for Robbins' transfer

upon learning that Robbins was a veteran. Neither statement is supported by citation to evidence in the record. The Court concludes that summary judgment is appropriate as to plaintiff's claim regarding appropriate medical screening.

◼ As to plaintiff's claim for violation of the transfer provisions of EMTALA, case authority again has placed a high hurdle. The plaintiff must prove that the hospital had *actual knowledge* of the individual's unstabilized emergency medical condition prior to transfer. *Urban,* 43 F.3d at 526. It is true that defendants did not write "emergency condition" in the medical records. However, as plaintiff argues, "the requirement of knowledge of the emergency medical condition does not permit the hospital to blithely characterize life-threatening symptoms as non-emergent, and claim ignorance of the risk in the face of a clear-cut emergency". (Plaintiff's response at 9).

◼ When Robbins arrived at TRMC, he was reported in the Treatment Record as having "spont[aneous] arterial bleeding from [left] fem[oral]/pop[liteal] surg[ery] site ... while laying in bed." He was subsequently diagnosed with Pseudoaneurysm and hemorrhage (spontaneous) at the left femoral/popliteal graft site. In the Court's view, these conditions meet EMTALA's definition of "emergency medical condition" in 42 U.S.C. § 1395dd(e)(1)(A), which describes "serious jeopardy" to health, "serious impairment" to "bodily functions" and "serious dysfunction of any bodily organ or part." This view is also supported by the expert testimony presented by plaintiff. Defendants protest that this is "hindsight", which the EMTALA does not permit. There is a delicate balance between improperly judging by hindsight what a defendant *might* have perceived as an emergency and a defendant's self-serving denial of an emergency. The Court believes the balance in this case weighs for the plaintiff.

◼ This does not end the Court's inquiry, however. Under EMTALA, a hospital may transfer an unstabilized [1] patient with an emergency condition if the patient or a legal representative gives informed consent *or* a physician certifies that the benefits expected from the transfer outweigh the risks of effecting the transfer. § 1395dd(c)(1). Under the disjunctive language of the statute, either of these circumstances preclude liability. TRMC argues that both were satisfied in this case.

Regarding physician certification, it is true Dr. Gentry signed a certification which mirrors the statutory language of (c)(1)(A)(ii) regarding benefits versus risks. However, the certification signed by Dr. Gentry appears to merely certify that the "risk versus benefits" analysis was explained to the patient. EMTALA contemplates that the physician certify that *the physician* has determined that the medical benefits outweigh the attendant risks. The certification in this case does not so reflect. Also, the statute requires that the certification "include a summary of the risks and benefits upon which the certification is based." The Court sees no such summary in the certification.

Thus, plaintiff's EMTALA claim stands or falls on the issue of consent. Robbins signed a consent to transfer. The document states that "I acknowledge that my medical condition has been evaluated and explained to me by the Emergency Department physician ... who has recommended that I be transferred.... The

---

1. Stabilizing a patient means to provide treatment as is necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during a transfer. § 1395dd(e)(3)(A), (B).

potential benefits of such transfer, the potential risks associated with such transfer and the probable risks of not being transferred have been explained to me and I fully understand them. With this knowledge and understanding, I agree and consent to be transferred."

§ 1395dd(c)(1)(A)(i) actually describes the requirement as the patient *requesting* transfer in writing. Here, it is undisputed that Robbins signed a portion of the multipart form applicable to a patient for whom transfer is recommended by the hospital. Robbins did not sign the specific provision of the form applicable when the transfer is at the patient's request. Defendants argue that this was a mere clerical error and that transfer was in fact at Robbins' "adamant" request. In light of Robbins' condition and the fact that he did in fact sign another portion of the form, the Court holds this to be a question of fact for the jury.

Assuming arguendo that "informed consent" by a patient to a hospital's recommended transfer would satisfy (c)(1)(A)(i), the Court also concludes summary judgment is inappropriate. In view of the fact that the defendants deny that they had actual knowledge that Robbins was in an emergency situation, it is not conclusively established that all the risks of transfer were properly explained to Robbins before his signature was obtained.

It is the Order of the Court that the motion of Tulsa Regional Medical Center for partial summary judgment (# 100) is hereby DENIED.